1  SPENCER RAWLINS BRASURE

2  # P10000, SQSP

3  SAN QUENTIN CA. 94974

4  PLAINTIFF  PRO-SE

5

6

7

8  UNITED STATES DISTRICT COURT

9  NORTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  SPENCER RAWLINS BRASURE, | CASE NO. C08-01943 JF |
| 12  PLAINTIFF | PLAINTIFF'S REQUEST FOR |
| 13  V. | JUDICIAL NOTICE OF PRIOR |
| 14  ROBERT AYERS JR. ET. AL. | COURT PAPERS; AS EXHIBIT. |
| 15  DEFENDANT'S | |

16

17  TO: THE HONORABLE JEREMY FOGEL, JUDGE OF THE UNITED

18  STATES DISTRICT COURT, FOR THE NORTHERN DISTRICT OF CALIFORNIA.

19  PLEASE TAKE NOTICE, OF THE PLAINTIFF'S REQUEST FOR THE COURT

20  TO TAKE JUDICIAL NOTICE OF THE PRIOR COURT PAPERS.

21  1. THE CASE OF: LANCASTER ETAL. V. TILTON ET AL. NO. C79-1630WHA.

22  UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA; THE

23  INTERVENER'S MOTION TO ENFORCE CONSENT DECREE, 13 PAGES; AND THE

24  DEFENDANT'S OPPOSITION TO INTERVENER'S MOTION TO ENFORCE CONSENT

25  DECREE, 7 PAGES; ATTACHED HERETO. 20 PAGES TOTAL AS EXHIBITS.

26  DATED. AUGUST 19. 2008              RESPECTFULLY SUBMITTED

27                                     Spencer R. Brasure

28                                     SPENCER RAWLINS BRASURE
                                       PLAINTIFF  PRO-SE

FILED

2008 AUG 26 P 2: 52

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST OF CA. S.J.

EXHIBIT

1  SPENCER RAWLINS BRASURE

2  # P 10000, SQSP

3  SAN QUENTIN CA. 94974

4  PLAINTIFF PRO-SE

5

6

7

8            UNITED STATES DISTRICT COURT

9         NORTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  SPENCER RAWLINS BRASURE. | CASE No. C08-01943 JF |
| 12             PLAINTIFF | PLAINTIFF'S REQUEST FOR |
| 13       V. | JUDICIAL NOTICE OF PRIOR |
| 14  ROBERT AYERS JR, ET. AL. | COURT PAPERS; AS EXHIBIT. |
| 15          DEFENDANT'S | |

16

17  TO: THE HONORABLE JEREMY FOGEL, JUDGE OF THE UNITED

18  STATES DISTRICT COURT, FOR THE NORTHERN DISTRICT OF CALIFORNIA.

19    PLEASE TAKE NOTICE, OF THE PLAINTIFF'S REQUEST FOR THE COURT

20  TO TAKE JUDICIAL NOTICE OF THE PRIOR COURT PAPERS.

21   1. THE CASE OF: LANCASTER ETAL. V. TILTON ET AL. NO. C79-1630WHA.

22  UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA; THE

23  INTERVENER'S MOTION TO ENFORCE CONSENT DECREE, 13 PAGES; AND THE

24  DEFENDANT'S OPPOSITION TO INTERVENER'S MOTION TO ENFORCE CONSENT

25  DECREE, 7 PAGES; ATTACHED HERETO. 20 PAGES TOTAL AS EXHIBITS.

26  DATED. AUGUST 19. 2008          RESPECTFULLY SUBMITTED

27                    Spencer R. Brasure

28                    SPENCER RAWLINS BRASURE
                     PLAINTIFF PRO-SE

EXHIBIT

Charles Carbone (CA SBN 206546)
CALIFORNIA PRISON FOCUS
2940 16th Street, Suite B-5
San Francisco, California 94103
Telephone: 415-252-9211
Facsimile: 415-252-9311

Diana Samuelson (CA SBN 78013)
506 Broadway
San Francisco, California 94133
Telephone: 415-986-5591
Facsimile: 415-421-1331

Attorneys for Intervener Freddie Fuiava

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREW LANCASTER, et al. | Case No. C-79-1630 WHA |
| Plaintiffs, | INTERVENER'S MOTION TO ENFORCE CONSENT DECREE |
| V. | |
| JAMES E. TILTON, et al. | |
| Defendants. | |
| _____/ | |
| FREDDIE FUIAVA, | |
| Intervener. | |
| _____/ | |

## I.    INTRODUCTION

In response to the Court's Order Following November 16, 2006 Hearing, Intervener Fuiava submits this motion to enforce the provisions of the consent decree and its implementing Institutional Procedures No. 608 that require Defendants to follow state law as promulgated in Title 15,

California Code of Regulations.  Intervener anticipates that
Plaintiffs' class counsel will raise Defendants' non-compliance
with other specific provisions of the decree relating to other
conditions of confinement (e.g., exercise, food service,
sanitation, noise, hobby craft) with which Intervener joins.

Defendants have blatantly refused to apply state law,
i.e., Title 15 of the California Code of Regulations (CCR), to
the condemned inmate population in the areas of disciplinary
actions and gang classifications despite the decree's -- and its
implementing procedures, IP 608 -- explicit requirement that
Title 15 should be applied.  Such selective exclusion of the
reach of Title 15 to the condemned population violates not only
the spirit[1] but also the plain language of the consent decree.

## II.  ARGUMENT

### A. The Present Decree Requires That Title 15 of the California Code of Regulations Applies to the Condemned Population Without Exemption.

The substance of the existing decree is found in its
implementing procedures, Institutional Procedures No. 608 (IP
608).  The existing IP 608 dated April 1, 1999, states that
"Departmental manuals and institutional policies and procedures
applying to all CDC inmates are adjunct to this manual."  (See

---

1/ As the Ninth Circuit recognized, the purpose of the decree
was to afford the condemned population the same protection as
non-condemned inmates placed in maximum security administrative
segregation.  *Thompson v. Enomoto* (9th Cir. 2000) 220 F.3d 987,
995, fn.8 (9th Cir. 2000)

Exhibit A.)   Intervener agrees with Plaintiffs' interpretation

of this same clause that was inserted by Defendants in their

proposed revised IP 608:

> The word 'adjunct' means 'something attached
> to another in a dependent or subordinate
> position.'   Thus, if and when the new unit
> is occupied, new IP 608 would control policy
> and procedure in other CDCR manuals and
> other local San Quentin policies and
> procedures.   However, Title 15 of the
> California Code of Regulations is not a
> 'Departmental manual" or local
> 'institutional policies and procedures' and
> thus would remain applicable to condemned
> prisoners.

(Plaintiffs' Motion for Order Approving Stipulation for

Modification of the Consent Decree and Memorandum of Points and

Authorities in Support Thereof, dated July 20, 2006, at page 13,

footnote 8.)   Hence, this same clause in the existing IP 608

cannot be interpreted to mean that its provisions supercede the

requirements of Title 15.

The Defendants themselves addressed the question of

whether San Quentin's Institutional Procedures supercede state

law embodied in Title 15 and concluded that they do not.   In

granting a San Quentin inmate's administrative appeal on whether

San Quentin's IP 215 could conflict with Title 15 Section 3190

(relating to an inmates' purchase of personal property packages

based upon their privilege group), the Chief of Inmate Appeals

ruled in favor of the inmate, holding "the local California

State Prison, San Quentin (SQ) IP 215 cannot be more restrictive

than the CCR [California Code of Regulations]" and ordered San

Quentin to modify its Institutional Procedures to conform to
Title 15.   (Exhibit B.)

Furthermore, at least one section of the IP 608
specifically recognizes the applicability of Title 15.

> Section 701.  Disciplinary Policy, Condemned
> Section.  The disciplinary procedures and
> policies used in San Quentin Condemned
> Sections will comply with the California
> Code of Regulations, Title 15.

(Exhibit C.)  Yet, as discussed in the following section,
Defendants' disciplinary actions do not comport with Title 15.

With respect to classification decisions, the consent
decree specifies that "classification and reclassification shall
be in accordance with existing Departmental and Institutional
Classification procedures." (Section IV.B.1, page 5 of Decree,
attached as Exhibit D.)  This very language was interpreted by
Judge Weigel in his 1982 ruling in this case, then titled
*Thompson v. Enomoto*.  Plaintiffs had argued that Defendants were
in contempt of the decree because they were not following a
court decision in *Wright v. Enomoto* (N.D. Cal. 1976) 462 F.Supp.
397.  In rejecting Plaintiffs' argument, Judge Weigel held that
the Defendants were obligated to follow "the existing procedures
for reclassification of condemned inmates [as] set forth in 15
Cal. Adm. Code §3375." *Thompson*, 542 F.Supp. 768, 770.  In so
ruling, the Court made clear that the consent decree
incorporates the regulations of state law above any other set of
court-imposed procedures.

Defendants have given as an excuse for its non-compliance with Title 15 as to gang classification that it needed greater "flexibility" for the condemned population than for mainline inmates. (RT April 6, 2006 hearing, pages 21-22, 40.)  However, as discovery recently furnished by the Defendants reveals, San Quentin has in fact followed Title 15's regulations for classifying an inmate as a validated gang member before imposing an indeterminate Security Housing Unit term.  As recent as 2003, the Inmates Appeals Branch rejected a condemned inmate's appeal, noting that "the validation process was done in keeping with the requirements of California Code of Regulations, Title 15, Section (CCR) 3378.  The Law Enforcement Investigation Unit (LEIU) reviewed the documentation submitted by the Institution Gang Investigator and verified the validation of the appellant...."  (Exhibit E.)

San Quentin's refusal to afford these protections consistently to all condemned inmates demonstrates the very arbitrariness regarding which Intervener and many other class members have complained, discussed *infra*, in violation of another provision of the consent decree which provides that "classification decisions shall be ... exercised in a non-arbitrary and non-capricious manner" (Section IV.D., page 6 of Consent Decree, attached hereto as Exhibit F).

        **B.    Defendants' Disciplinary and Classification Actions Do Not Comport with Title 15 and Are Arbitrary and Capricious.**

Article 5, Sections 3310 to 3326 ("Inmate Discipline") and Article 6, Sections 3330 to 3333 ("Disciplinary Detention") and Article 7, Section 3341.5(c)(B) ("Determinate SHU Segregation") of Title 15 provide specific protections to condemned inmates. In addition, as Plaintiffs point out in their Motion For Order Approving Stipulation filed July 20, 2006, federal law "requires that the substantive decision to segregate a prisoner not be arbitrary or capricious." (Motion at 19.) Intervener and numerous other class members have provided this Court with documentation of San Quentin's blatant violation of these regulations, resulting in disparate and discriminatory punishment of inmates for the same offense, in violation of their federal constitutional rights to due process and equal protection.

Even though San Quentin's IP 608 has specifically directed that Title 15 should be followed, administrators' actual practice has been to impose arbitrary SHU terms for disciplinary violations rather than those set forth in Title 15, section 3341.5. For example, Intervener received a Rules Violation Report for mutual combat with several other inmates on a Grade A group exercise yard on February 17, 1997. He was punished by reassignment to Grade B and transferred to the SHU (Adjustment Center). If Title 15 had been followed, the most severe disciplinary punishment he could have received, a

determinate term in Administrative Segregation, according to
Section 3341.5, would have been between two to twenty-four
months (if it were construed as an assault upon another inmate).
However, over two years later, Intervener was still on Grade B
status in the Adjustment Center, although he had remained
disciplinary free.  The rationale given was the administrators'
"current concerns over the safety of Southern Hispanics in the
Grade A population."[2]  When Intervener began contesting his
continued classification, the justification for keeping him on
Grade B status morphed into alleged gang association.  (See,
Declaration of Counsel in support of Motion To Intervene.)

        The comments received by the Court in response to the
class notice establish a pattern and practice of arbitrary
action.  For example, inmates Jones and Zapien complain that San
Quentin administrators rely on the current decree to justify
keeping inmates in the Adjustment Center well past the
expiration of their term of punishment for a rules violation
specified by the regulations that apply to all state prisoners
contained in Title 15 of the California Code of Regulations.
(See, Summary attached to Declaration of Diana Samuelson in
Support of Opposition to Class Certification (Docket No. 954),
at pages 9, 11.)  Inmate Valdez alleges that officials exploit

_____

2/  Although Mr. Fuiava is of Samoan heritage, prison officials
have classified him with "Southern Hispanics" due to his county
of origin, Los Angeles, and references in his Central File to
prior prison association with this group

the vague language of the decree to violate their rights and
that it is applied in a disproportionate manner.  (Id. at 10.)
Inmates Bolin and Avena assert that the officials rely on false
information in making classification decisions and that they use
confidential informants to retaliate against prisoners who file
grievances and impose arbitrary punishment on members of
disfavored groups, such as the southern Hispanics.  (Id. at 12,
16.)  Inmate Cox, and dozens of other inmates who signed his
affidavit, also allege that the classification process is unfair
because prison officials refuse to follow the safeguards of
Title 15.  (Id. at 13.)

San Quentin officials have also taken the unauthorized
action of resurrecting a policy called "property control" that
deprives inmates of all personal property (including television,
radio, canteen items, newspapers, magazine and other non-legal
reading materials) for indefinite periods of time, commonly
reviewed at 90-day intervals.  When initially re-implemented in
2003, this policy was imposed only upon inmates who
"demonstrated a propensity for violence."  More recently,
however, it is being applied indiscriminately to inmates for any
rules violation.  (See document number 975, by inmate Michael
Flinner, received 10/20/06.)  It is also being used to punish
inmates for refusing to interview with staff regarding
investigation of alleged criminal activity of other inmates.
Not only does this practice raise constitutional questions, but

it is in direct violation of Parts VI.E.15 and VI.L.3 of the
Consent Decree, as recognized in the Monitor's Sixth Report,
filed November 11, 1995. San Quentin officials have simply
ignored the Monitor's directive that before implementing this
practice again, it must submit a proposal to the court for
review. Report at 30-31.

Beginning in April, 2006, San Quentin administrators
have engaged in another disciplinary practice that violates the
Consent Decree and constitutional safeguards provided by the
Fifth and Fourteenth Amendments (due process and self-
incrimination protections). Under this policy, which has been
executed on two occasions over the last several months, an
inmate is punished for his refusal to participate in interviews
intended to assist prison officials' investigation of suspected
criminal activity. The disciplinary scheme is progressive,
beginning with "confinement to quarters" for an unlimited period
of time (including denial of outdoor exercise for periods in
excess of the 10 days authorized in the Monitor's Sixth Report,
page 26, and denial of non-legal visits), followed by a formal
rules violation report and imposition of "property control," and
finally, corporeal, and cruel and unusual, punishment in the
form of "cell extractions" which resulted in serious injury to
approximately a dozen inmates, including Intervener, on October
3, 2006. Most recently, San Quentin officials have denied
Adjustment Center inmates access to legal visits. (See Exhibit

G, counsel's letter to Warden Ayers.)

Intervener has alleged that there is a long-standing administrative bias against the "Southern Hispanic" ethnic group with which he has been classified (Motion To Intervene, page 18), and that this bias is manifested in classification decisions that have denied him and many others access to the Grade A program despite being disciplinary free for many years. Documents produced by the Defendants in response to Plaintiffs' discovery requests establish the following forms of discrimination: use of racial epithets (i.e., "wetback")(Exhibit H, SQ#04606, administrative appeal); targeting for corporeal punishment in the form of cell extractions (Exhibit I, SQ#4508, Intervener's administrative appeal); denial of assignment of Southern Hispanics to group exercise yards in the Adjustment Center (Declaration of Counsel); refusal to assign pay number to the Southern Hispanic Grade A group yard (inmate Vierra's comments to the Court, Exhibit J); denial of Grade A status solely because no group exercise yard was made available (*Ibid.*; Exhibit C to Motion To Intervene);

## CONCLUSION

When this case was filed 27 years ago, Plaintiffs alleged that the "regimen imposed upon them by defendants is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States" and "denies plaintiffs equal protection and due process of the

law in violation of the Fourteenth Amendment to the
Constitution...and violates defendants' own rules and California
statutory provisions." (Complaint attached as Exhibit A to Fama
declaration filed 7/20/06.) The consent decree was crafted to
remedy these violations, yet Defendants continue to resist
compliance. Prisoners' comments and objections received by the
Court over the past several months demonstrate that San Quentin
officials remain in violation of the existing decree's
prohibition against arbitrary and capricious classification
decisions, specifically those imposing indeterminate SHU terms
for alleged gang affiliations and disciplinary violations.
Enforcement of the decree's provisions is long overdue.

DATED: March 31, 2007.

Respectfully submitted,

_____/S/_____
Charles F.A. Carbone

_____/S/_____
Diana Samuelson

Attorneys for Intervener


DECLARATION OF COUNSEL

I, Diana Samuelson, declare as follows:

1. I am one of the attorneys representing Intervener
Fuiava in these proceedings.

2. I have reviewed the discovery furnished by the
Defendants, which includes Adjustment Center Yard Lists for the

year 2006.  Those lists reflect that there are four groups of
inmates who are assigned to the two group yard facilities on
alternating days: "White/Southern Hispanic" yard and "Re-
Integrated Mix Yard #1" (Sunday, Tuesday and Friday); and
"Black/Northern Hispanic" yard and "Re-Integrated Mix Yard #2"
(Monday, Wednesday and Saturday).  The size of these group yards
approximates a basketball court.

    3.  The vast majority of Adjustment Center inmates,
which includes mainline Administrative Segregation inmates, are
assigned to 10' x 20' "single walk alone exercise yards"
otherwise known as Individual Exercise Yards (IEY).  As the
Court will observe when conducting its anticipated tour of the
facility, only half of those cages (17 of the 34) are considered
"operational" by administrators, which results in an ongoing
violation of the consent decree's minimum exercise requirements.
Some 70 inmates, including Intervener, are rotated into these
IEPs; and depending on the weather and other external factors,
such a staff shortages, an inmate may get outdoor exercise one
or two times per week.  For example, discovery documents
indicate that Intervener was provided with seven days of
exercise in Feburary 2007.

    4.  Administrators have assigned only between two to
five inmates to each Adjustment Center group yard, in stark
contrast to the six group yards afforded to East Block Grade A
inmates, several of which have upwards of 75 inmates.  Further,

the discovery documents reflect that there have been no Southern
Hispanic inmates assigned to the "White/Southern Hispanic" yard
for over a year, since January 2006, although there are
approximately 20 inmates classified as Southern Hispanic in the
Adjustment Center.

I declare under penalty of perjury that the foregoing,
as well as any factual representation made in the attached
Motion, are true and correct based upon my information and
belief.  Executed on March 31, 2007, at San Francisco,
California.


_____/s/_____ _____
Diana Samuelson

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DAVID S. CHANEY
   Chief Assistant Attorney General
3  FRANCES T. GRUNDER
   Senior Assistant Attorney General
4  ROCHELLE C. EAST
   Supervising Deputy Attorney General
5  DAMON G. McCLAIN, State Bar No. 209508
   Deputy Attorney General
6  JULIANNE MOSSLER, State Bar No. 243749
   Deputy Attorney General
7   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
8   Telephone: (415) 703-5746
    Fax: (415) 703-5843
9   Email: Julianne.Mossler@doj.ca.gov

10 Attorneys for Defendants Tilton and Ayers

11

12          IN THE UNITED STATES DISTRICT COURT

13         FOR THE NORTHERN DISTRICT OF CALIFORNIA

14             SAN FRANCISCO DIVISION

15

16 | ANDREW LANCASTER, et al., | Case No. C 79-01630 WHA |

17 | Plaintiffs, | DEFENDANTS' OPPOSITION TO INTERVENER'S MOTION TO ENFORCE CONSENT DECREE |

18 | v. | |
   JAMES E. TILTON, et al.,

19 | Defendants, | |

20 | | Date:        June 14, 2007 |
   | | Time:        8:00 a.m. |

21 | FREDDIE FUIAVA, | Courtroom:   9, 19th Floor |
   | | Judge:       Hon. William Alsup |

22 | Intervener. | Trial Date:  TBA |
   | | Action Filed: July 6, 1979 |

23

24     Defendants Tilton and Ayers respectfully submit the following memorandum of points

25 and authorities in opposition to Intervener's Motion to Enforce Consent Decree.

26 ///

27 ///

28 ///

Opp. Intervener's Mot. Enf. Consent Decree

                          1

                          Lancaster, et al. v. Tilton, et al.
                          Case No. C 79-01630 WHA

## MEMORANDUM OF POINTS AND AUTHORITIES

## ARGUMENT

### I.

### DECISIONS REGARDING INMATE HOUSING AND CLASSIFICATION DO NOT IMPLICATE THE EIGHTH AMENDMENT.

In his motion, Intervener Fuiava challenges his classification as a Grade B inmate and his housing in the Adjustment Center (AC). Defendants oppose Intervener's motion because prisoners do not have a constitutional right to choose where they will live. *Meachum v. Fano*, 427 U.S. 215, 224 (1976). Recently, the Ninth Circuit specifically held that "[b]ecause the mere act of classification 'does not amount to an infliction of pain,' it 'is not condemned by the Eighth Amendment." *Myron, et al. v. Terhune, et al.*, 476 F.3d 716, 719 (9th Cir. 2007). Therefore, Intervener's complaints regarding his classification as a Grade B inmate and housing in the AC do not state a claim under the Eighth Amendment. Courts cannot order any "relief that binds prison administrators to do more than the constitutional minimum." *Gilmore v. People of the State of California*, 220 F.3d 987, 999 (9th Cir. 2000). And provisions of the consent decree that exceed the constitutional minimum are not enforceable. *Id.*

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court denied an inmate's claim that his constitutional rights had been violated when prison officials placed him in segregated confinement for 30 days. The Court held that a prisoner possesses a liberty interest secured by the U.S. Constitution when a change occurs in confinement that imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. But a prisoner does not have a liberty interest in remaining free from disciplinary segregation when he suffers "no major disruption in his environment" and the length of his sentence is not affected. *Id.* at 486-87.

In the present case, Intervener has not alleged a liberty interest that meets the standards established in *Sandin*. First, the length of the condemned inmates' sentences is not affected by their classification. Second, Grade B inmates do not suffer a major disruption in their environment. In fact, the Grade B inmates housed in the Adjustment Center (like Intervener)

1  have larger cells than the Grade A and Grade B inmates who are housed in East Block. (Decl. of

2  Dacanay, ¶ 2.)

3       Intervener is asking the court to second-guess prison officials' determinations regarding

4  which inmates pose heightened security risks. This request flies in the face of the Supreme

5  Court's caution against involving federal courts in the day-to-day management of prisons.

6  *Sandin,* 515 U.S. at 482. Instead, the Court has held that federal courts should afford appropriate

7  deference and flexibility to state officials trying to manage a volatile environment. *Wolff v.*

8  *McDonnell,* 418 U.S. 539, 561-63 (1974). Such flexibility is especially warranted in the fine-

9  tuning of the ordinary incidents of prison life. *Sandin,* 515 U.S. at 483. The Supreme Court's

10  rulings are precisely applicable to the facts of the present case, in which prison officials are

11  required to employ their expertise to make decisions regarding inmate housing and programs that

12  directly affect institutional safety and security. Not only does Intervener fail to identify a liberty

13  interest, he asks this Court to involve itself in an inappropriate matter that squanders judicial

14  resources with little offsetting benefit to anyone. *Sandin,* 515 U.S. at 482.

15                                    **II.**

16  **DISCIPLINARY HEARINGS ARE CONDUCTED IN COMPLIANCE**
    **WITH THE SUPREME COURT'S HOLDING IN** *SUPERINTENDENT V.*
17  *HILL.*

18       The question of classification aside, Intervener asserts that Defendants' disciplinary

19  procedures are applied in an arbitrary and capricious manner. (Mot. Enforce Consent Decree,

20  beginning on page 5, subsection B.) But with regard to Intervener in particular, he gives an

21  example of the even-handed and deliberative approach prison officials use to address his

22  persistent rules violations. (Mot. Enforce Consent Decree, at p. 9.)

23       An investigation was initiated in August 2006 following the attempted murder of an

24  inmate on the AC's White/Southern Mexican group yard. (Decl. of Dacanay, ¶ 3.) The unit was

25  placed on lock-down following the attack. (*Id.*)

26       The investigation proceeded and by October 2006, correctional staff began efforts to

27  interview inmates in the AC. (*Id.* ¶ 4.) This was done by escorting the inmates one-at-a-time to

28  a sergeant's office where they were asked if they were willing to participate in the interview

1  process. (*Id.*) Inmates who declined to participate were returned to their cells, given back their

2  yard privileges, and no further disciplinary action was taken against them. (*Id.*) The inmates

3  who refused to be escorted to the sergeant's office, including Intevener, were issued a 128-A

4  custodial chrono. (*Id.*)

5  The following week, an number of the inmates who had initially refused the escort

6  complied. (*Id.* ¶ 5.) As with the first group, those inmates had their yard privileges restored

7  regardless of their willingness to cooperate with the interview. (*Id.*) The remaining inmates who

8  continued to refuse the escorts, including Intervener, were issued Rules Violation Reports, and

9  given disciplinary hearings. (*Id.*)

10  Property restriction was imposed only after the disciplinary hearings proved insufficient

11  to compel the remaining inmates to comply with the escort. (*Id.* ¶ 6.) In order to impose

12  property restrictions, inmates must be removed from their cells. (*Id.*) Of the twenty-four inmates

13  who continued to refuse the escort, twelve voluntarily exited their cells for the purpose of

14  allowing officers to remove their property. (*Id.* ¶ 7.) The final twelve inmates, including

15  Intervener, refused lawful orders to exit their cells to allow officers to remove their property,

16  thereby forcing correctional staff to perform cell extractions. (*Id.* ¶ 8.) Intervener attacked

17  correctional staff during his cell extraction and was issued another Rules Violation Report. (*Id.* ¶

18  9; Decl. of Dull, Exs. A, B.)

19  Intervener complains about the imposition of property restriction as a disciplinary

20  sanction for rules violations. (Mot. Enforce Consent Decree, at p. 9). But property restriction

21  does not violate the Eighth Amendment, and the court cannot grant "relief that binds prison

22  administrators to do more than the constitutional minimum." *Gilmore*, 220 F.3d at 999.

23  Further, Intervener's own conduct demonstrates why prison officials must be afforded

24  latitude in the way they respond to disciplinary issues among the condemned population. (Decl.

25  of Dull, Exs. A–F.) ""To allow prisoners to choose which jailhouse rules they will obey would

26  result in chaos."" *LeMaire*, 12 F.3d at 1462 (quoting *Stenzel v. Ellis*, 916 F.2d 423, 428 (1990)).

27  Because condemned inmates do not earn credits toward release as do general population inmates,

28  prison officials have limited resources to compel condemned inmates to comply with prison

1    rules. Defendants must therefore, be allowed to rely on alternative disciplinary measures such as

2    property restriction to encourage condemned inmates to follow the rules. "Because we have told

3    prison administrators they cannot use sticks to punish behavior, it would be bizarre also to rule

4    out reasonable carrots." *Id.*

5         The Supreme Court has held that when a prison disciplinary hearing may result in the loss

6    some liberty interest, the inmate must receive: (1) advance written notice of the disciplinary

7    charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to

8    call witnesses and present documentary evidence in his defense; and (3) a written statement by

9    the factfinder of the evidence relied on and the reasons for the disciplinary action. *Superintendent*

10   *v. Hill*, 472 U.S. 445, 454 (1985) citing to *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974).

11   San Quentin follows the noticed hearing procedures outlined by the Supreme Court when

12   conducting hearings on Rules Violation Reports.  (Decl. of Dacanay, ¶ 10.)  Decisions to impose

13   disciplinary measures satisfy constitutional requirements so long as there is "any evidence in the

14   record that could support the conclusion reached by the disciplinary board." *Superintendent*, 472

15   U.S. at 455-56.  Intervener has presented no evidence to suggest that the guilty findings on his

16   numerous disciplinary violations were not supported by "some evidence."

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1

## CONCLUSION

2      Intervener's motion should be denied because the relief he seeks exceeds the

3  constitutional minimum, and because Defendants conduct disciplinary proceedings in accordance

4  with the requirements set out in *Sandin*.

5      Dated:  May 8, 2007

6                                          Respectfully submitted,

7                                          EDMUND G. BROWN JR.
                                           Attorney General of the State of California

8                                          DAVID S. CHANEY
                                           Chief Assistant Attorney General

9
                                           FRANCES T. GRUNDER
10                                         Senior Assistant Attorney General

                                           ROCHELLE C. EAST
11                                         Supervising Deputy Attorney General

12                                         DAMON G. McCLAIN
                                           Deputy Attorney General

13

14                                         *Julianne Mossler*

15                                         JULIANNE MOSSLER
                                           Deputy Attorney General
16                                         Attorneys for Defendants Tilton and Ayers

17  20087544.wpd

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF SERVICE BY MAIL

I, _SPENCER R. BRASURE_ , the undersigned, declare:
      Printed Name of Declarant

I am over the age of 18 years, a citizen of the United States of America, and am not a party to the cause within. My residence address is:

           CDC No. _P10000_      Housing _1-AC-2_
           San Quentin State Prison
           San Quentin, CA 94974

On _AUGUST 19TH._ , _2008_ , I served the following document(s):
    Month/Day      Year

_PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE OF PRIOR COURT PAPERS_
_AS EXHIBIT, 20 PAGES._

on the parties and at the addresses described below by placing the pleadings in a sealed envelope, with postage fully prepaid, and presented said item(s) to Corrections Department staff for mailing in the United States Mail as per the rules and regulations governing outgoing legal mail at San Quentin State Prison.

_SUPERVISING DEPUTY ATTORNEY_
_ATTORNEY GENERAL'S OFFICE_
_CORRECTIONAL LAW SECTION_
_455 GOLDEN GATE AVE, SUITE 11000_
_SAN FRANCISCO, CA. 94102-7004_

I swear under penalty of perjury that the foregoing is true of my own personal knowledge. Executed on this _6TH._ day of _AUGUST_ , _2008_ , at San Quentin, CA, County of Marin.

                               Spencer R. Brasure
                                 Signature of declarant